**NOT FOR PUBLICATION**

```
            UNITED STATES DISTRICT COURT
               DISTRICT OF NEW JERSEY
```

|  |  |
|---|---|
| SHAROB ABDUL-AZIZ, | : |
| Plaintiff, | : CIVIL ACTION NO. 08-5764 (MLC) |
| v. | : **O P I N I O N** |
| MICHELLE RICCI, et al., | : |
| Defendants. | : |

**COOPER, District Judge**

Plaintiff moves for summary judgment in his favor. (Dkt. entry no. 39; see dkt. entry nos. 41, 42, Supplements to Motion; dkt. entry no. 46, Pl. Reply.) Defendants oppose Plaintiff's motion, and cross-move for summary judgment. (Dkt. entry 43; see dkt. entry no. 47, Defs. Reply.) The motion and cross motion are being considered on the papers pursuant to Local Civil Rule 78.1. The Court, for the reasons set forth below, will grant the cross motion in part and deny the motion.

## BACKGROUND

Plaintiff submitted a complaint, asserting claims under (1) 42 U.S.C. § 1983 for violations of constitutional rights, (2) the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and (3) state law. (Dkt. entry no. 1, Compl.) Plaintiff named as defendants Michelle Ricci, the Administrator of the New Jersey State Prison ("NJSP"); Donald Mee, NJSP Assistant Administrator; Captain William Moleins, an NJSP employee; and Sergeant Clay McClain, an NJSP supervisor.

The Complaint asserted that Defendants did not accept donated Halal meals or meat for the Islamic Eid Feast, did not allow Islamic inmates to retain prayer oils, retaliated against Plaintiff, reassigned him to a less desirable job, and placed him in temporary closed custody ("TCC") for several days without issuing disciplinary charges. (Id., Statement of Claims.)

Plaintiff then filed an amended complaint. (Dkt. entry no. 5, Am. Compl.) The following is a summary of the case background from the Opinion screening the Amended Complaint:

> [Plaintiff] refers back to 2006 and a history of the prison's treatment of meals for the Muslim Eid Holidays, and the treatment of Muslim inmates in general. In June 2008, Plaintiff wrote an administrative remedy asking: "one, what is administration's current policy regarding Muslim inmates making congregational prayer during recreation and individually at work assignments during bathroom breaks and lunch breaks? [T]wo, what is administrations's current policy regarding Muslim inmates possessing prayer oil in their cells? [T]hree, what is administration's current policy regarding Muslim inmates having donated HALAL MEALS for Id Feast from approved vendor?" (Am. Compl., ¶ 10.)
>
> Mee responded to the remedy on July 29, 2008, stating: "Your request for the above mentioned policies is denied. Secondly, inmates are not permitted to retain oils. Thirdly, Meal or foods are not permitted to come from an outside source." (Am. Compl., ¶ 11.) Plaintiff appealed the denial of his remedy.
>
> On August 12, 2008, Mee stopped Plaintiff in the hallway and asked him if he wanted a transfer out of the prison. Plaintiff said he did, but not until he finished exhausting administrative remedies on these issues. Mee told him that he was becoming "a pain in my ass" and that he "look[ed] to return the favor." (Am. Compl., ¶ 13.) Three days later, a search was conducted by McClain on the South Compound Visit Hall, where Plaintiff stored his musical equipment, and where Muslims have Friday Prayer. (Am. Compl., ¶ 14.) McClain took five memory cards from his equipment. Plaintiff states that because Muslims do

not have their own PA system for services, they used his personal equipment during services. Upon his inquiring why his memory cards were taken, Plaintiff was told that he was not permitted to have memory cards. Plaintiff then asked for a charge or confiscation slip. He also showed the administration that he had approvals for all of the memory cards and other equipment from Mee. Although Plaintiff states that his equipment was returned a couple of hours later, apparently his memory cards were given to the Special Investigative Division ("SID"). (Am. Compl., ¶¶ 14, 15).

On August 19, 2008, Mee went to Plaintiff's cell and watched television, then walked away. About an hour later while at work, officers told Plaintiff that he was being "TCC'd," meaning placed in Temporary Closed Custody. Plaintiff was not told why he was being placed in TCC or given any charges. He was not given any personal property to take with him, and was told that all of his property was seized by SID. (Am. Compl., ¶ 16.)

On August 23, Plaintiff filed an administrative remedy concerning the incident, and on August 28 he was released from TCC and returned to his housing unit, with none of his property. (Am. Compl., ¶¶ 17-19.) He received his property back on September 4, along with a contraband slip of confiscated property, including a radio, a fan, and books. Plaintiff objects to the procedures used to confiscate his property. (Am. Compl., ¶ 20.) Ricci later issued a memo to the prison population stating that memory cards were no longer permitted. (Am. Compl., ¶ 22.)

Plaintiff also complains about the content of meat in vegetarian meals (Am. Compl., ¶ 24), and a memo from Ricci stating that because of budgetary concerns, all religious groups will only be allowed to receive the "meal of the day" for their holidays. Plaintiff states that "[a]s a result, the Muslim community has declined their holiday banquet." He notes that Jewish inmates receive a Kosher diet three times a day, seven days a week, which is paid for by the State. (Am. Compl., ¶ 25.)

Plaintiff asserts another claim concerning his job placement. In January 29, 2009, after working for two years as a Forms Room File Clerk, Plaintiff was terminated from his job for having a speaker on his computer. Plaintiff states the speaker was on the computer before his assignment to the job. (Am. Compl., ¶¶ 26, 27.) He received a disciplinary charge for misuse or possession of electronic equipment, because of the speakers. Plaintiff states there is no rule stating that speakers are

3

> prohibited. The charges were eventually dismissed. (Am. Compl., ¶¶ 28, 29.)
>
> Nevertheless, on February 11, 2009, Plaintiff was reassigned to cell sanitation, resulting in an 80% pay reduction. Plaintiff wrote remedy forms concerning his job assignment, and that he was not reinstated to his prior job even though the charges were dismissed, and proper rules were not in place. (Am. Compl., ¶ 30.) Plaintiff's remedy forms were responded to, and it was found that there were speakers and music files on the computer, and that the decisions made concerning reassignment were appropriate. Plaintiff appealed the remedy denials stating that he was being retaliated against, and the appeals were denied. (Am. Compl., ¶¶ 31-34.)
>
> Plaintiff asserts that his constitutional rights have thus been violated. He claims he was retaliated against for filing civil suits and remedies. He also claims that his right to practice his religion was violated, and that conditions in the TCC violated his Eighth Amendment rights by amounting to cruel and unusual punishment. He further claims his due process rights were violated by being placed in TCC without a hearing. He asks for monetary and other relief.

(Dkt. entry no. 8, Op. at 2-5.)

The Court entered the Opinion, cited above, and an Order permitting the claims concerning religion and retaliation to proceed. Defendants filed an answer. (Dkt. entry no. 25.) A scheduling order was entered, and on November 18, 2010, Plaintiff filed a motion for summary judgment, which was denied as premature. (Dkt. entry nos. 27, 28.) Defendants' motion to depose Plaintiff was thereafter granted, Plaintiff's deposition was taken, and Plaintiff's motion to compel discovery was granted in part. (Dkt. entry nos. 31, 33, 35.) Plaintiff now moves for summary judgment, and Defendants oppose and cross-move for summary judgment. (Dkt. entry nos. 39, 43.)

**DISCUSSION**

**A.   Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). A genuine issue of material fact exists if the evidence is such that a reasonable jury could find for the non-movant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

The burden of establishing the nonexistence of a genuine issue is on the party moving for summary judgment. See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). The movant may satisfy the burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the non-movant must "make a showing sufficient to establish the existence of [every] element

essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Also, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must identify those facts of record which would contradict the facts identified by the movant." Corliss v. Varner, 247 Fed.Appx. 353, 354 (3d Cir. 2007) (quotations omitted).

In deciding the merits of a motion for summary judgment, a court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  See Anderson, 477 U.S. at 249.  Credibility determinations are the province of the factfinder, not a district court.  See Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

**B.   Plaintiff's Motion for Summary Judgment**

Plaintiff argues that Defendants (1) denied him Halal Eid Feast meals and fed him contaminated vegetarian meals, (2) denied him prayer oils, (3) used TCC, and removed him from his institutional job, as punishment, and (4) used his music equipment to retaliate and harass and intimidate.

**C.   Defendants' Cross Motion for Summary Judgment**

Defendants argue that the Plaintiff's claims are barred, as (1) he failed to exhaust administrative remedies, (2) Defendants did not violate Plaintiff's rights because they were not allowed

6

to accept donated food, religious vegetarian meals do not contain meat, and prayer oils are provided to Muslim inmates during religious services, (3) concerning the retaliation claims, Plaintiff was not engaged in a constitutionally protected activity and not subject to adverse action, (4) they are entitled to qualified immunity, and (5) Plaintiff's request for injunctive and punitive relief are without merit.

### D.  Religion Claims

#### 1.  Halal Meals

The Court notes that:

> [w]ith regard to the First Amendment claim . . . the prison was not required to provide meals containing halal meat, given that the prison provided vegetarian meals that complied with halal rules, the practice was reasonably related to the prison's legitimate interests in simplified food service, security, and operating within budget constraints, and the prison provided Muslim inmates with significant alternative means of practicing their religion.  As to the inmates' Equal Protection claim, [the Third Circuit] concluded that no violation occurred because the evidence in the record showed that the kosher meals provided to Jewish inmates were also vegetarian.

Adekoya v. Chertoff, 431 Fed.Appx. 85, 88 (3d Cir. 2011) (internal citations omitted) (citing Williams v. Morton, 343 F.3d 212, 215-16 (3d Cir. 2003) (plaintiffs were Muslims at NJSP and alleged that prison officials violated federal and state constitutional rights by failing to provide plaintiffs with Halal meat meals, but provided vegetarian meals)).

Plaintiff here does not dispute this key issue of law.  But he asserts that (1) there are donations available that contain

Halal meals with meat that the prison refused to accept, and (2) the vegetarian meals provided by NJSP are actually not vegetarian, but contain pork and beef.  Plaintiff asserts that Jewish inmates are provided Kosher meals everyday, paid for by the State.

The Court, after reviewing the record, finds that Defendants are entitled to summary judgment on the claim regarding religious meals.  NJSP cannot accept donated Halal meals.  See N.J.S.A. § 52:20-13 (authority to accept donations of personal property by gift or grant is vested in New Jersey Department of Treasury).  Furthermore, Department of Corrections ("DOC") policy states that "no food items shall be donated by a religious faith group or purchased through an inmate group account for a religious holiday and or holy day meal, unless the food item(s) is determined as necessary".  (See dkt. entry no. 43, Kim Decl., Ex. K.)  Approved food items include those required for religious services, such as sacramental wine, bread, herbs, and dates.  (Id.)

Plaintiff's claim that the vegetarian meals are contaminated is unfounded. He cites a deposition transcript from 2001 from the Williams case, and a letter from Schreiber Foods.  The deposition transcript is ten years old, and the letter states only that trace amounts of certain enzymes could be present in the School Choice American Cheese.  Such a statement has no bearing here, as Plaintiff has not shown that School Choice American Cheese has any connection to NJSP, or was used to prepare religious vegetarian meals.

8

It has been shown, however, that the religious vegetarian meals provided to NJSP are not contaminated. The DOC Regional Food Service Supervisor declares that the religious vegetarian meals distributed at NJSP do not contain meat or American cheese. He also declares that the meals contain powder cheddar cheese, which is not made with meat. (See dkt. entry no. 43, McCauley Decl. at ¶¶ 3-5.)

### 2. Prayer Oils

Plaintiff claims that his constitutional rights have been violated because he is not allowed to possess prayer oils at NJSP. He asserts that inmates were once allowed to receive oils at service and retain them in their cells as personal property, but that prayer oils were confiscated out of cells, with inmates receiving disciplinary charges for possessing said oils, when Ricci became Administrator. Plaintiff asks that he, and the NJSP Islamic community, be allowed to retain "a reasonable amount- at least 5 ounces of prayer oils[, as] personal property in their cells. Be that through commissary or outside store order." (Dkt. entry no. 39, Pl. Br. at 10.)

Plaintiff does not assert that possession of oils in his cell is necessary for the practice of his religion, and does not dispute that he is permitted to use the oils during services. (See dkt. entry no. 43-6, Pl. Dep. at 130-31.)

Evidence in the record demonstrates that at NJSP, prayer oils are not approved for retention in cells as personal property

9

because of safety reasons. While the oils may be permitted at prisons with lesser security levels, NJSP is a maximum security prison, and different rules and policies apply. (See dkt. entry no. 43, Holmes Decl. at ¶¶ 2, 14.) The record also shows that prayer oils are not considered mandatory religious items. Evidence in the record shows that NJSP recognizes and permits the use of the oils during religious services. Imam Rasoul Suluki is approved to bring the oils to NJSP and distribute them during services. Suluki states in his declaration that while prayer oil is a "custom or recommended practice," it "is not part of the Islamic Fard, which is an obligatory or mandatory practice." (See dkt. entry no. 43, Suluki Decl. at ¶¶ 4, 5.)

### 3. RLUIPA

The statute states:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). If, in a civil action, the plaintiff "produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a [RLUIPA violation], the government shall bear the burden of persuasion on any element of the claim." 42 U.S.C. § 2000cc-2(b). However, the plaintiff still "bear[s] the burden of persuasion on whether the law

(including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." Id.

A "substantial burden" exists when "(1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; or (2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." Washington v. Klem, 497 F.3d 272, 280 (3d Cir. 2007). Also, RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." Cutter v. Wilkinson 544 U.S. 709, 722 (2005).

### 4. Summary Judgment Standard Applied to Religion Claims

Plaintiff's request for summary judgment regarding the religion claims will be denied, and Defendants' request for summary judgment on the religion claims will be granted.

Plaintiff here does not dispute that he is receiving prayer oils for services. His claim that he would like to retain the oil in his cell is without merit, as the record shows that (1) such retention is not necessary for the practice of his religion; and (2) NJSP sees retention of the oils in cells as a security issue. While Plaintiff disputes that he is receiving vegetarian meals, his claim is based on historical data, and is nothing more than a conclusory allegation.

11

As to RLUIPA, Plaintiff's exercise of his religion was not substantially burdened. As to prayer oils, Suluki's Declaration shows that the precepts of Islam are being followed and that NJSP is not infringing on them. As to the meals, Plaintiff is being provided with vegetarian meals, so he does not need to either forgo meals to satisfy the mandates of his religion, or eat the meals in violation of the mandates of his religion. Plaintiff's allegations that the meals are not actually vegetarian is not substantiated in the record.

Defendants also have shown a compelling state interest for their policies and actions. See Cutter, 544 U.S. at 725 n.13 ("prison security is a compelling state interest, and . . . deference is due to institutional officials' expertise in this area"); Fraise v. Terhune, 283 F.3d 506, 516 (3d Cir. 2002) ("deference is especially appropriate when a regulation implicates prison security").

Plaintiff has not rebutted Defendants' showing of entitlement to summary judgment as to these claims. The Court finds that there is no issue for trial as to Plaintiff's religion claims, and Defendants will be awarded summary judgment here.

**E.   Retaliation Claims**

   **1.   TCC**

Plaintiff argues that he filed grievances within NJSP and to other agencies "regarding the prison administration's failure to

12

abide by their own rules." (Pl. Br. at 10.)  Plaintiff filed remedies with Mee in June through August 2008.

On August 15, 2008, after a search, an officer discovered five digital media cards rolled up in Muslim prayer rugs.  They were confiscated, and Plaintiff was placed in TCC on August 19, 2008.  Plaintiff claims that this was done in retaliation for his filing of grievances, and that as the cards were confiscated, there was no reason for him to be placed in TCC, as opposed to having a "regular inmate disciplinary charge."  Plaintiff was in TCC for nine days.  Upon release from TCC, Plaintiff did not receive his personal property back for over a week, and when he did, the items were broken, and some were missing.  (Pl. Br. at 12-13.)

As an example of the unreasonableness of Defendants' conduct, Plaintiff notes that in 2006, a gun was found in NJSP, and all inmates were removed from their cells and searched.  The search of all of the inmates and cells took 10-12 hours, and the inmates were returned to their cells.  By contrast, Plaintiff "spent 9 days in the hole, 2 weeks without a change of cloth[es] or any personal property."  Thus, Plaintiff alleges that "the defendants clearly used the memory cards as an excuse for their retaliation."  (Id. at 13.)

Defendants argue that "Plaintiff's placement in TCC was due to the contraband, and not in retaliation, especially since it was SCO Kline" — a non-defendant — "who confiscated them."  (Dkt.

13

entry no. 43, Defs. Br. at 29.) Defendants also argue that Plaintiff admitted that the cards were his. (Id. at 12, 29.)

"Retaliation for constitutionally-protected activity is itself a violation of rights secured by the Constitution actionable under section 1983." White v. Napoleon, 897 F.2d 103, 112-13 (3d Cir. 1990). A prisoner litigating a retaliation claim therefore need not prove that he had an independent liberty interest in the privilege that he was denied. See Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001). Rather, to establish a claim for retaliation under § 1983, a plaintiff must prove that: (1) he engaged in constitutionally protected conduct; (2) he was subjected to adverse actions by a state actor; and (3) the protected activity was a substantial motivating factor in the state actor's decision to take the alleged adverse action. See Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997). Once a prisoner demonstrates that his exercise of a constitutional right was a substantial motivating factor in the decision to take the alleged adverse action, the burden shifts to prison officials to prove that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest. See Rauser, 241 F.3d at 334.

Plaintiff filed a grievance against Defendants, which is constitutionally-protected conduct. See Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003). However, the allegation of a mere temporal connection between Plaintiff's complaints and his

14

placement in TCC is not sufficient for this retaliation claim to survive summary judgment, as his placement was the result of legitimate penological interests.  See Romero v. Hayman, No. 09-1041, 2011 WL 1344218, at *9 (D.N.J. Apr. 8, 2011).  In addition, upon the record presented on the motion and cross motion for summary judgment, Plaintiff has not rebutted Defendants' showing that the amount of time that he spent in TCC was not unusual and not meant to have a retaliatory effect, as opposed to being the result of the finding of the suspected contraband.  See Georges v. Ricci, No. 07-5576, 2007 WL 4292378, at *2, *5 (D.N.J. Dec. 4, 2007) (finding, inter alia, no constitutional violation wherein prisoner asserted that he was held in TCC for six days as retaliation for engaging in protected activity); see also Baker v. Williamson, No. 11-1824, 2011 WL 6016931, at *2-3 (3d Cir. Dec. 5, 2011) (prisoner plaintiff failed to rebut defendants' argument that he was not placed in administrative custody for 12 days for retaliatory reasons).

**2.   Job Reassignment**

Defendants, however, have not made a showing of entitlement to summary judgment on the segment of the retaliation claims concerning Plaintiff's job reassignment.  The Court, upon a review of Defendants' submissions, can find no argument from them explaining why the reassignment should not be viewed as an act of retaliation.  (See Defs. Br. at 29-30.)  Defendants assert that

15

Plaintiff was reassigned due to the disciplinary infraction concerning the computer (id. at 30), but the charges against Plaintiff were apparently dismissed. (Pl. Br. at 15.) Thus, there remains a question of fact as to whether false disciplinary charges were issued against Plaintiff, due to his filing grievances, resulting in Plaintiff's job reassignment to cell sanitation and an 80% pay reduction. (Pl. Br. at 14-15.) Indeed, Plaintiff states that the speaker at issue had been attached to his computer since he started his job assignment in 2007.

### 3. Qualified Immunity

Having determined that Plaintiff has a viable retaliation claim concerning his job reassignment, the Court turns to the question of whether qualified immunity would nonetheless protect Defendants from this claim.

The qualified immunity doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. This doctrine provides a government official immunity from suit rather

16

than a mere defense from liability.  See id.  A court must undertake a two-step inquiry to determine the applicability of qualified immunity:

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of a defendant's alleged misconduct. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.

Montanez v. Thompson, 603 F.3d 243, 250 (3d Cir. 2010).

"Where a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right." Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997).  "Only if the plaintiff carries this initial burden must the defendant then demonstrate that no genuine issue of material fact remains as to the 'objective reasonableness' of the defendant's belief in the lawfulness of his actions." Id.  In determining whether a defendant is entitled to qualified immunity, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236.  If the answer to either question is "no," the analysis may end there.  See id. at 236-37 (finding that because unlawfulness of officers' conduct

was not clearly established, officers were entitled to qualified immunity, without having to answer question of whether officers violated plaintiff's constitutional rights).

Plaintiff, to avoid the effects of qualified immunity, must show that it would have been clear to a reasonable corrections officer that the conduct engaged in by Defendants was unlawful in the situation presented. Here, Plaintiff alleges that Defendants brought about his job reassignment with a malicious and retaliatory intent. Defendants have not made a showing that they acted without retaliatory intent in bringing about the job reassignment. Consequently, the Court finds that Defendants are not entitled to qualified immunity at this time as to Plaintiff's retaliation claim concerning the job reassignment.

**F.   Remedies**

Punitive damages are available for § 1983 claims "not only where there is a malicious intent or evil motive, but also where the defendants acted with a reckless or callous disregard of, or indifference to, the rights and safety of others." Bennis v. Gable, 823 F.2d 723, 734 (3d Cir. 1987) (quotations omitted). "In order to recover punitive damages, the plaintiff must prove that the defendant's conduct was wantonly reckless or malicious. The question of whether defendants' conduct was wantonly reckless or malicious is one for the finder of fact". Domm v. Jersey Printing Co., 871 F.Supp. 732, 739 (D.N.J. 1994). "The issue of punitive damages is a fact question which should be decided by a jury."

<u>Id.</u>  Based on the evidence presented, a reasonable jury could find that Defendants' conduct concerning the job reassignment was malicious, and thus that Plaintiff should be awarded punitive damages.

The injunctive relief sought as to the religion claims are now moot, as Defendants will be awarded summary judgment on those claims.  But Plaintiff also seeks procedural protections for TCC inmates; return and reimbursement of his lost or broken property, his prior job assignment with back pay; and for NJSP to institute compliance standards for inmates using computers.

Because Plaintiff is a prisoner litigant, the Court must consider the Prison Litigation Reform Act ("PLRA") before granting injunctive relief.  When granting injunctive relief, the PLRA mandates that four criteria must be met: (1) the relief must be narrowly drawn; (2) the relief must extend no further than necessary to correct the violation of the federal right; (3) the relief must be the least intrusive means necessary to correct the violation of the federal right; and (4) substantial weight must be given to any adverse impact on public safety or the operation of the criminal justice system that might be caused by the relief.  <u>See</u> 18 U.S.C. § 3626(a)(2).

The injunctive relief requested by Plaintiff for the retaliation against him is not narrowly drawn, but rather vague.  Further, Plaintiff's request for his prison job to be restored

and for back pay would adversely impact the operation of NJSP, as presumably Plaintiff's prior job has been filled.

As to the property claims, Plaintiff has a post-deprivation remedy. Property loss caused by the intentional acts of government officials does not give rise to a procedural due process claim under § 1983 where a post-deprivation remedy satisfying minimum procedural due process requirements is available under state law. See Zinermon v. Burch, 494 U.S. 113, 115 (1990); Hudson v. Palmer, 468 U.S. 517 (1984). The New Jersey Tort Claims Act provides a post-deprivation remedy to persons believing they were deprived of property by the State. See Holman v. Hilton, 712 F.2d 854, 857 (3d Cir. 1983).

For the foregoing reasons, Defendants' request for summary judgment on Plaintiff's punitive damage claims, insofar as they relate to the retaliation claims concerning Plaintiff's job reassignment, is denied. Defendants' request for summary judgment on the claims for injunctive relief is granted, as Plaintiff cannot likely attain the relief he seeks.

## CONCLUSION

The summary judgment motion by Plaintiff is denied. The cross motion by Defendants for summary judgment is granted in part. The Court will issue an appropriate order.

                                          s/ Mary L. Cooper
                                          **MARY L. COOPER**
                                          United States District Judge

Dated:    December 28, 2011